UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE

| CLARENCE R. HULL, Jr., | ) | |
|---|---|---|
| Plaintiff, | ) | |
| v. | ) | No.: 2:20-CV-94-TAV-CRW |
| CORPORAL ROBERT GUIZZOTTI, NURSE JAMIE JOHNSON, and NURSE DOUGLAS CORNETT, | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

This matter is before the Court on defendants' motions for summary judgment [Docs. 123, 128]. Plaintiff has responded [Doc. 126, 133], and defendants have replied [Doc. 127, 134]. For the reasons that follow, defendants' motions for summary judgment [Docs. 123, 128] will be **GRANTED** and this case will be **DISMISSED**.

**I.  Background**

    **A.  Plaintiff's Evidence**

In his sworn amended complaint,[1] plaintiff asserts that on March 7, 2020, a "Nurse Johnson"[2] gave him the wrong medication, namely, trazadone[3] instead of Tylenol

---

[1] A sworn complaint "carries the same weight" as an affidavit for purposes of summary judgment. *El Bey v. Roop*, 530 F.3d 407, 414 (6th Cir. 2008).

[2] As will be discussed below, there is a dispute as to the identity of the "Nurse Johnson" who allegedly interacted with plaintiff in March 2020. Accordingly, the Court will refer to "Nurse Johnson" when discussing the individual plaintiff allegedly interacted with, and "Nurse Jamie Johnson" when discussing the named defendant.

[3] At some points in his amended complaint, plaintiff contends that he was given trazadone, while at other points, he contends that he was given Viagra. However, this discrepancy is irrelevant for purposes of the Court's analysis of the pending motions for summary judgment.

[Doc. 9, p. 3]. The next day, plaintiff informed Nurse Johnson that he was experiencing pain in his genitals and had been experiencing an erection since the night before [*Id.* at 4]. He purportedly told Nurse Johnson that he was experiencing pain so severe that he could barely walk or sit down. Plaintiff states that Nurse Johnson told him that the earliest he could be seen was the next day, and ultimately walked away from plaintiff while he was speaking [*Id.*].

On March 9, 2020, Nurse Douglas Cornett called plaintiff to the medical room and asked him what was wrong, to which plaintiff responded that he has been experiencing an erection for several days and was in so much pain that he could not sleep and could barely walk [*Id.*]. After examining plaintiff's genitals, Nurse Cornett informed plaintiff that an erection lasting longer than four hours required a visit to the emergency room ("ER") [*Id.* at 5]. Nurse Cornett stated he would talk to "Dr. Logan"[4] about plaintiff's medical condition and that plaintiff should prepare to be taken to an outside hospital or ER. However, plaintiff contends he never heard anything further from Nurse Cornett [*Id.*].

Plaintiff states that he continuously asked an officer if he had heard anything further because he was in so much pain, and the officer eventually contacted Nurse Cornett, who stated that he had spoken with NP Edwards, and he should have seen plaintiff [*Id.*]. Plaintiff then asked the officer to call Corporal Robert Guizzotti [*Id.* at 6]. When Corporal Guizzotti arrived, plaintiff explained the situation and stated that he needed to see medical

---

[4] Dr. Logan is later identified as Nurse Practitioner ("NP") Logan Edwards, and the Court will refer to this individual as "NP Edwards."

personnel and was now experiencing problems urinating. Corporal Guizzotti stated that he would call, but later returned and reported that another officer had already called several times and if NP Edwards wanted to see plaintiff, he would call for him. Plaintiff claims that he later learned that medical had called Corporal Guizzotti to bring plaintiff to the infirmary, but Corporal Guizzotti was busy and forgot [*Id.*].

Plaintiff contends that, after a shift change, another officer and corporal took him to the infirmary, where he saw another nurse, who asked him about the medication he had taken, ultimately informing him that the pill he recalled taking was Viagra [*Id.* at 6–7]. That nurse called another doctor who advised that plaintiff should be sent to an outside hospital or ER [*Id.* at 7]. Plaintiff was ultimately taken to the ER, and allegedly had "2 emergency surgeries and stitches . . . in two different places on [his] penis" resulting in "life altering disfigurement" [*Id.* at 8].

Plaintiff submits a medical record from March 10, 2020, from Franklin Woods Community Hospital [Doc. 126, p. 5]. This record states that plaintiff presented to the ER with complaints of an erection for the past 48 hours. It further states "[t]he ER provider attempted aspiration of the penis and was able to remove about 2ml on each side. Patient reported some relief. Urology was consulted. Per ER Physician, Dr. Rogers feels it is likely clotted due to the duration of the erection" [*Id.*].

**B.      Defendants' Evidence**

In his declaration, Nurse Cornett states that he was working at the Northeast Correctional Complex ("NEXC") on March 9, 2020 [Doc. 125-1, p. 1]. The day prior, the

3

sick call office received a request from plaintiff stating that he needed "to see doctor about meds due to permanent nerve damage in my left foot caused by 3rd degree burn in 2015 need my Robaxin" [*Id.* at 1, 5]. After arriving for his shift in the infirmary of the administrative segregation unit of NEXC, where plaintiff was housed, Nurse Cornett began seeing inmates who had submitted sick call requests, including plaintiff [*Id.* at 1]. At approximately 8:45 a.m., plaintiff was brought to Nurse Cornett for examination, at which point plaintiff continued to complain of the neuropathic pain in his foot but also informed Nurse Cornett that his penis was erect [*Id.* at 1–2]. In his contemporaneous notes, Nurse Cornett noted "erection penis swollen; tender to touch; 0 discoloration noted states 'I never had this happen this long,' semi-erect appearance" [*Id.* at 2, 7]. He also noted that plaintiff informed him that he "had a prolonged erection for the last 24 [sic] and it usually goes away but not now" [*Id.* at 8]. Nurse Cornett stated that, based on his observation, plaintiff's erection looked normal, and the situation did not present a medical emergency [*Id.* at 2].

Nurse Cornett stated that, per facility policy, in order for plaintiff to receive treatment for his penis, he would need to be seen by a higher-level provider who could diagnose or treat the injury such as a registered nurse or physician [*Id.*]. Nurse Cornett therefore immediately referred plaintiff to the infirmary charge nurse for evaluation and treatment, as he did not have authority to authorize off-site care. Nurse Cornett spoke to the charge nurse, Natalie Linkus at the nurses' station and informed her that plaintiff needed to be seen by a nurse practitioner for his erection. Linkus instructed Nurse Cornett to contact NP Edwards, which Nurse Cornett did. NP Edwards then informed Nurse

4

Cornett that plaintiff needed to be transported to the medical unit for examination. However, Nurse Cornett was not allowed to leave the segregation unit to personally escort or transport inmates to different locations [*Id.*].

Nevertheless, Nurse Cornett states that, within 15 to 20 minutes of examining plaintiff, he had referred plaintiff to NP Edwards, and then contacted Corporal Guizzotti to inform him that plaintiff needed to be transported to the medical unit [*Id.* at 3]. After his first call to Corporal Guizzotti, Nurse Cornett returned to seeing inmates, but, approximately an hour later, called Corporal Guizzotti a second time to check on plaintiff's status and reiterate that plaintiff needed transportation to the medical unit for treatment. Nurse Cornett ultimately left his shift on March 9 between 5:00 and 5:15 p.m., after contacting Corporal Guizzotti a third time to ensure that plaintiff would be transported to the medical unit. At no point on March 9, however, did Nurse Cornett believe that plaintiff's complaint regarding his penis required urgent medical attention [*Id.*].

In his declaration, Corporal Guizzotti states that on March 9, 2020, he was working as a corporal in the segregation unit of NECX [Doc. 125-2, p. 1]. Shortly after 8:45 a.m., he escorted plaintiff to an appointment with Nurse Cornett in the infirmary and waited outside while plaintiff was in the room with Nurse Cornett for approximately 15 minutes. Directly following the examination, neither Nurse Cornett nor plaintiff mentioned anything about plaintiff's penis [*Id.*]. Less than an hour after escorting plaintiff back to his cell, Corporal Guizzotti received a phone call from Nurse Cornett and learned that plaintiff

5

needed to be taken to the medical unit for treatment but did not learn the reason that plaintiff required transportation to the medical unit [*Id.* at 1–2].

Because of plaintiff's classification as administrative segregation, two officers were required to transport him from the segregation unit to the medical unit [*Id.* at 2]. After receiving the call from Nurse Cornett, Corporal Guizzotti called the Yard Sergeant to let him know that plaintiff needed a two-person medical transport team. The Yard Sergeant acknowledged the request but stated that he and other staff were busy but would provide transportation as soon as they were able. Corporal Guizzotti stated that he was not permitted to physically leave the segregation unit to transport or escort any inmate. At around 11:00 a.m., Corporal Guizzotti contacted the Yard Sergeant a second time about plaintiff's transport but received the same response. Between 3:00 and 4:00 p.m., plaintiff called Corporal Guizzotti to his cell and attempted to show him his penis. Corporal Guizzotti did not view plaintiff's penis, but ensured plaintiff that officers were working to have him transported to the medical unit. Before he left his shift around 6:00 p.m., Corporal Guizzotti informed the officer replacing him on the segregation unit that plaintiff was still awaiting a two-man transportation team to take him to the medical unit [*Id.*]. However, Corporal Guizzotti states that, at no time did he believe that plaintiff was experiencing a serious medical need that required immediate treatment, and, in fact, he was unaware of the specific medical need for which plaintiff required transportation to the medical unit [*Id.* at 3].

6

In her declaration, Nurse Jamie Johnson states that, prior to January 23, 2020, she provided medical care to inmates at NECX, but, on or about January 23, 2020, she ended her employment at NECX [Doc. 131, p. 1]. From January 31, 2020, to May 2, 2021, she was solely working for Parkdale Mills [*Id.*]. Accordingly, on March 8 and 9, 2020, she did not interact with plaintiff as she was not present at NECX and not employed at NECX [*Id.* at 2]. She states that signatures on various medical documents dated after January 2020, are not her signature [*Id.* at 2–3]. Nurse Jamie Johnson attaches a letter from a human resources manager at NECX stating that she was a contract employee at NECX from March 3, 2019, to January 23, 2020 [*Id.* at 5]. She also attaches a letter from a human resources manager at Parkdale Mills indicating that she began employment at that company on January 31, 2020, and continued that employment through May 2, 2021 [*Id.* at 6].

## II. Standard of Review

Rule 56(a) of the Federal Rules of Civil Procedure provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In ruling on a motion for summary judgment, the court must draw all reasonable inferences in favor of the nonmoving party. *McLean v. 988011 Ontario Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). As such, the moving party has the burden of conclusively showing the lack of any genuine issue of material fact. *Smith v. Hudson*, 600 F.2d 60, 63 (6th Cir. 1979). To successfully oppose a motion for summary judgment, "[t]he non-moving party . . . must present sufficient evidence from which a jury could reasonably find for him." *Jones v. Muskegon*

7

*Cnty.*, 625 F.3d 935, 940 (6th Cir. 2010) (citing *Anderson v. Liberty Lobby, Inc.*, 447 U.S. 242, 252 (1986)).

## III. Analysis

### A. Timeliness

The Court first addresses the timeliness of the pending motions for summary judgment. The Court initially set this case for trial on July 26, 2022, and set the dispositive motion deadline 150 days prior to that trial date [Doc. 31]. Thereafter, the Court granted a request to extend the dispositive motion deadline to March 28, 2022 [Doc. 64]. However, the Court subsequently denied a request for a further extension of the dispositive motion deadline [Doc. 83]. Nonetheless, defendants filed their motions for summary judgment on September 21, 2022, and November 10, 2022, respectively [Docs. 123, 128]. Defendant now opposes the Court's acceptance of these late-filed motions [Doc. 126, pp. 1–2].

As the Eastern District of Kentucky has noted, "deadlines are important things. And when the Court establishes deadlines, the parties are obliged to follow them." *Century Indemnity Co., v. Begley Co.*, 323 F.R.D. 237, 239 (E.D. Ky. 2018). Nevertheless, "the Court is not inclined to strike an untimely filing that resulted in no delay in the proceedings." *Blankenship v. Parke Care Centers, Inc.*, 913 F. Supp. 1045, 1049 (S.D. Ohio 1995).

Here, while the Court acknowledges that defendants' motions for summary judgment are untimely, the Court nonetheless finds good cause to consider the belated filings. Specifically, the Court notes that its consideration of these motions has not delayed

8

these proceedings, and plaintiff has not asserted any prejudice that would stem from the Court considering the belated filings. Moreover, addressing these belated motions serves the interests of judicial economy and efficiency by allowing the Court to review whether summary judgment is appropriate, and therefore, whether a trial is necessary. Accordingly, despite their untimeliness, the Court, in its discretion, will consider the merits of the motions.

### B.     Merits

At this stage, the only remaining claim in this case is plaintiff's deliberate indifference claim against the three moving defendants [Docs. 10, 112]. A prison official's deliberate indifference to a prisoner's serious medicals needs violates the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). Prison medical personnel or officials may be deliberately indifferent to serious medical needs "in their response to the prisoner's needs" or by "intentionally interfering with treatment once prescribed." *Id.* at 104–05. Establishing a violation of the Eighth Amendment in the medical context requires evidence that that acts or omissions of an individual operating under the color of state law were "sufficiently harmful to evidence deliberate indifference to serious medical needs." *Id.* at 106. Such a claim "has [both] objective and subjective components." *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 895 (6th Cir. 2004).

Under the objective prong, the Court must determine whether the plaintiff had a sufficiently serious medical need. *Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir. 2008). A plaintiff may establish a serious medical need in two ways: (1) by showing that the medical

9

need was so obvious that even a layperson would easily recognize the need for medical treatment; or (2) if the medical need was less obvious, by showing the detrimental effect of a delay in treatment. *Blosser v. Gilbert*, 422 F. App'x 453, 460 (6th Cir. 2011) (citing *Blackmore*, 390 F.3d at 897–99).

Where a prisoner's claim arises from an injury that a layperson would easily recognize required a doctor's attention, the prisoner does not need to present medical evidence to establish that a delay in treatment harmed him. *Blackmore*, 390 F.3d at 899–900. But where the claim arises out of "the prison's failure to treat a condition adequately, or where the prisoner's affliction is seemingly minor or non-obvious," *id.* at 898, the prisoner must "place verifying medical evidence in the record" to establish that the delay in treatment had a detrimental effect on his condition. *Santiago v. Ringle*, 734 F.3d 585, 590 (6th Cir. 2013) (quoting *Napier v. Madison Cnty.*, 238 F.3d 739, 742 (6th Cir. 2001)).

The subjective component "requires a plaintiff to prove that the doctors had a 'sufficiently culpable state of mind' equivalent to criminal recklessness." *Santiago*, 734 F.3d at 591 (quoting *Farmer v. Brennan*, 511 U.S. 825, 834, 839–40 (1994)). This standard requires more than mere negligence, and therefore "when a prison doctor provides treatment, albeit carelessly or inefficaciously, to a prisoner, he has not displayed a deliberate indifference to the prisoner's needs[.]" *Id.* (internal quotation marks and alterations omitted). To meet this subjective standard, the defendant must have: (1) "subjectively perceived facts from which to infer substantial risk to the prisoner,"

10

(2) "draw[n] the inference;" and (3) "then disregarded that risk." *Id.* (quoting *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001)).

### 1. Nurse Jamie Johnson's Motion

Nurse Jamie Johnson argues that plaintiff cannot establish either element of his deliberate indifference claim as to her, because she was not even at NECX on March 8 or March 9, 2020, and her last date of employment at NECX was January 23, 2020 [Doc. 129, pp. 9, 11]. Plaintiff responds that he spoke to a "Nurse Johnson" on March 7 and 8, 2020 [Doc. 133, p. 7]. He contends that there was a "Nurse Johnson" present at NECX on March 8, 2020 [*Id.* at 13]. Nurse Jamie Johnson replies that plaintiff does not cite anything in the record to demonstrate a genuine issue of material fact but merely offers unsupported statements [Doc. 134, p. 2].

The Court notes that Nurse Jamie Johnson raised this argument in a previous motion for summary judgment, and the Court denied the motion because she presented no evidence beyond her affidavit that she was no longer employed at NECX during the relevant time period, and therefore, the contradictory statements between herself and plaintiff created a genuine issue of material fact [Doc. 112, pp. 11–12]. However, Nurse Jamie Johnson now presents the Court with letters from human resource employees at both NECX and her subsequent employer, supporting her claim that she was not working at NECX during the relevant time period [Doc. 131, pp. 5–6].

The Supreme Court has held that "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could

11

believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007); *see also Coble v. City of White House, Tennessee*, 634 F.3d 865, 868–69 (6th Cir. 2011) (holding that *Scott* is not limited to cases involving videotape evidence). Although the Court previously found that it could not conclude that plaintiff's version of events was blatantly contradicted by the record solely on the basis of Nurse Jamie Johnson's contradicting affidavit [Doc. 112, p. 11], in light of the additional evidence now presented, the Court concludes that plaintiff's version of events is, indeed, blatantly contradicted by the record and no reasonable jury could believe it.

Although plaintiff vehemently contends that he interacted with a "Nurse Johnson" in March 2020, relating to his medical problem [Doc. 133, pp. 7, 13], he has offered no evidence that the "Nurse Johnson" with whom he interacted was the defendant, Nurse Jamie Johnson. And Nurse Jamie Johnson has presented evidence, in the form of her affidavit, and two human resource letters, all confirming that she did not work at NECX beyond January 2020 [Doc. 131, pp. 5–6]. Even looking to the medical records plaintiff offered in response to Nurse Jamie Johnson's first motion for summary judgment [Doc. 84, p. 7], as the Court previously noted, those medical records appear to have been signed by an individual with a first name other than Jamie [Doc. 112, pp. 10–11]. The Court thus finds that there is no genuine issue of material fact as to whether Nurse Jamie Johnson was at NECX in March 2020, and accordingly, no genuine issue of material fact as to her liability for deliberate indifference regarding the events set forth in the amended complaint.

12

The Court will therefore **GRANT** Nurse Jamie Johnson's motion for summary judgment [Doc. 128].

### 2. Nurse Cornett and Corporal Guizzotti's Motion

#### a. Objective Prong

The remaining defendants argue that plaintiff cannot satisfy the objective prong of his deliberate indifference claim because his condition was not a "sufficiently serious medical need" [Doc. 124, p. 6]. They contend that plaintiff's complaint of a "semi-erect penis" was not so obvious that a layperson would have easily recognized that he needed immediate medical attention [*Id.* at 7]. They argue that plaintiff never complained about any issue with his penis prior to his visit with Nurse Cornett on March 9, 2020, and Nurse Cornett's assessment of plaintiff's penis plainly demonstrates that it did not constitute a serious medical need [*Id.* at 8]. Finally, defendants argue that plaintiff failed to produce expert testimony, and therefore, cannot demonstrate that any alleged delay in being transported to the infirmary caused him to suffer injuries [*Id.* at 11].

Plaintiff responds that a person experiencing an erection for longer than 4 hours has a serious medical need [Doc. 126, p. 2]. He also contends that even a layperson would easily recognize that this condition requires medical attention [*Id.* at 3].

The Court notes that the question at this stage "is whether the average person would easily recognize—whether from observing the person or being told of his symptoms—that the plaintiff's condition needed treatment." *Gunther v. Castineta*, 561 F. App'x 497, 500 (6th Cir. 2014). This Court previously determined, as to another defendant, that

13

"a layperson easily would have recognized that [p]laintiff needed a doctor's attention . . . given the severity of the pain that [p]laintiff . . . [stated] he was experiencing, as well as the prevalence of television commercials warning that erections lasting more than four hours require medical attention" [Doc. 132, p. 14]. As to Nurse Cornett, plaintiff states that he informed Nurse Cornett that he had been experiencing an erection for several days and was experiencing so much pain that he could not sleep and could barely walk [Doc. 9, p. 4]. The Court finds that plaintiff's explanation of his symptoms, combined with the prevalence of television commercials warning about the dangers of erections lasting longer than four hours, would cause the average person to easily recognize that plaintiff's condition needed treatment. And, because plaintiff has shown a genuine issue of material fact as to whether a layperson would easily recognize his need for medical treatment, he is not required to set forth medical evidence that a delay in treatment caused a detrimental effect. *See Blackmore*, 390 F.3d at 899–900. Accordingly, there is a genuine issue of material fact as to whether plaintiff can establish the objective prong as to Nurse Cornett.

Turning to Corporal Guizzotti, plaintiff alleges that he explained to Corporal Guizzotti "my situation that I needed to see medical because something is wrong and its bad I'm now hav[]ing problems urinating due to the pain" [Doc. 9, p. 6]. Corporal Guizzotti, on the other hand, claims that he was never aware of the specific nature of plaintiff's medical need, although plaintiff did attempt to show Corporal Guizzotti his penis on one occasion while awaiting transport to the medical unit [Doc. 125-2, pp. 2–3]. Although a much closer call, viewing the evidence in the light most favorable to plaintiff,

14

and considering his pro se status, the Court finds a genuine issue of material fact as to whether plaintiff can establish the objective prong as to Corporal Guizzotti. While Corporal Guizzotti denies knowledge of plaintiff's underlying medical need, plaintiff's statement that he informed Corporal Guizzotti of his "situation" and that he was experiencing problems urinating due to the pain, while somewhat vague, appears to contradict Corporal Guizzotti's statement. And Corporal Guizzotti's admission that plaintiff attempted to show Corporal Guizzotti his penis while awaiting medical transport supports plaintiff's claim that he informed Corporal Guizzotti about his medical issue while awaiting transport. Accordingly, the Court finds a genuine issue of material fact as to whether, based on plaintiff's description of his symptoms to Corporal Guizzotti, a layperson would have easily recognized that plaintiff needed medical attention. And, again, because plaintiff has shown a genuine issue of material fact as to whether a layperson would easily recognize his need for medical treatment, he is not required to set forth medical evidence that a delay in treatment caused a detrimental effect. *See Blackmore*, 390 F.3d at 899–900.

### b. Subjective Prong

Nurse Cornett and Corporal Guizzotti next argue that plaintiff cannot satisfy the subjective prong of his deliberate indifference claim because he has not established that they intentionally delayed his access to medical care [Doc. 124, p. 8]. Defendants contend that there is affirmative evidence that they never disregarded any risk, even a negligible one, and took action to ensure plaintiff received appropriate treatment as soon as each of

15

them became individually aware of plaintiff's complaint about his penis, which resulted in plaintiff receiving further treatment [*Id.* at 9].  And, at no point in time on March 9, 2020, did either Nurse Cornett or Corporal Guizzotti believe plaintiff was experiencing a serious medical need that required immediate treatment [*Id.* at 10].  Both defendants made extensive efforts to ensure plaintiff was seen by a higher-level provider who could actually provide plaintiff with care in a different part of the facility, where neither defendant could personally transport him [*Id.*].

Plaintiff responds that defendants clearly acted with a culpable state of mind because he complained about his erection for two days, and nothing was done [Doc. 126, p. 3].

Here, the Court cannot say that there is any genuine issue of material fact as to whether Nurse Cornett or Corporal Guizzotti acted with a mental state that amounted to criminal recklessness, as required to establish the subjective prong of a deliberate indifference claim.  *See Santiago*, 734 F.3d at 591.  In his sworn amended complaint [Doc. 9], plaintiff generally alleges that there was a delay of 12 to 15 hours between his visit to Nurse Cornett and his ultimate transfer to the ER, but he provides little information regarding Nurse Cornett and Corporal Guizzotti's involvement in that delay.

As to Nurse Cornett, plaintiff merely alleges that, after his examination, Nurse Cornett told plaintiff that he would speak to NP Edwards and plaintiff should prepare to be taken to an outside hospital or ER [Doc. 9, p. 5].  Overall, this is consistent with Nurse Cornett's statement that, after examining plaintiff, he contacted NP Edwards about

16

plaintiff's condition, and repeatedly requested that Corporal Guizzotti ensure that plaintiff was transported to the prison's medical unit for further evaluation or treatment [Doc. 125-1, pp. 2–3]. Under these apparently undisputed facts, there is no genuine issue of material fact as to whether Nurse Cornett consciously disregarded a substantial risk of harm to plaintiff. Indeed, it appears that Nurse Cornett took several steps to ensure that plaintiff was transported to the prison's medical unit, where he could be evaluated and, if appropriate, approved for outside treatment. Although plaintiff contends that a delay occurred, he has pointed to no evidence that Nurse Cornett's actions were insufficient or caused any delay.

As to Corporal Guizzotti, plaintiff alleges that, after speaking to Corporal Guizzotti about his need for medical attention, Corporal Guizzotti looked into the matter and told plaintiff that NP Edwards had been called multiple times already [Doc. 9, p. 6]. He also alleges that medical had asked Corporal Guizzotti to transport plaintiff, but Corporal Guizzotti was busy and "forgot" [*Id.*]. While Corporal Guizzotti's version of events is inconsistent with plaintiff's, even accepting plaintiff's version of events as true, there is no genuine issue of material fact as to whether Corporal Guizzotti acted with more than mere negligence, which is insufficient to establish that he acted with deliberate indifference. *See Santiago*, 734 F.3d at 591. Forgetting to transport an inmate to the medical unit, while negligent, does not rise to the level of acting with criminal recklessness. *See Phaneuf v. Collins*, 509 F. App'x 427, 431 (6th Cir. 2012) ("a mere accident does not constitute deliberate indifference because it lacks a sufficiently penal-like intent"); *Acord v. Brown,*

17

43 F.3d 1471 (table), 1994 WL 679365, at *2 (6th Cir. Dec. 5, 1994) ("Accidents, mistakes, negligence and medical malpractice are not constitutional violations merely because the victim is a prisoner"); *Daugherty v. Ramey*, No. 5:19-cv-P31, 2019 WL 2330898, at *2 (W.D. Ky. May 31, 2019) ("forgetting to reorder [plaintiff's] medication is at most negligence and not deliberate indifference"). And there is nothing in plaintiff's allegation that Corporal Guizzotti declined to call NP Edwards after several calls had already been made that could rise to the level of criminal recklessness.

Accordingly, the Court finds no genuine issue of material fact as to whether either Nurse Cornett or Corporal Guizzotti acted with a sufficiently capable state of mind in addressing plaintiff's medical need in March 2020. For this reason, the Court will **GRANT** Nurse Cornett and Corporal Guizzotti's motion for summary judgment [Doc. 123].

## IV. Conclusion

For the reasons set forth above, defendants' motions for summary judgment [Docs. 123, 128] will be **GRANTED**. Plaintiff's claims will be **DISMISSED**. A separate order will follow.

IT IS SO ORDERED.

s/ Thomas A. Varlan
UNITED STATES DISTRICT JUDGE